**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0020-23

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

CHUCKY S. SCOTT a/k/a
CHUCKY SCOTT, LEWIS
AARON,

 Defendant-Appellant.

_____

  Argued May 12, 2026 – Decided July 1, 2026

  Before Judges Gilson and Perez Friscia.

  On appeal from the Superior Court of New Jersey, Law
  Division, Camden County, Indictment No. 18-02-0018.

  Gregory Margolis, Designated Counsel, admitted
  pursuant to Rule 1:21-3(c), argued the cause for
  appellant (Jennifer N. Sellitti, Public Defender,
  attorney; Laura B. Lasota, Deputy Public Defender II
  and Gregory Margolis, on the briefs).

  Daniel I. Bornstein, Deputy Attorney General, argued
  the cause for respondent (Jennifer Davenport, Attorney

General, attorney; Daniel I. Bornstein, of counsel and on the brief).

Appellant filed a supplemental brief on appellant's behalf.

PER CURIAM

Following an investigation into the illegal trafficking of guns, defendant Chucky Scott was indicted for thirty-five crimes related to the possession and illegal sale of firearms. In two motions, defendant sought to suppress cell phone location data and information obtained from searches of two of his cell phones. After both motions were denied, he pled guilty to first-degree racketeering, N.J.S.A. 2C:41-2(c) and N.J.S.A. 2C:41-2(d); and first-degree leader of a firearms trafficking network, N.J.S.A. 2C:39-16. Thereafter, he was sentenced to twenty-four years in prison with periods of parole ineligibility and parole supervision as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant now appeals from the orders denying his motions to suppress. Having reviewed defendant's arguments, the record, and law, we affirm both motion orders and defendant's convictions.

I.

A-0020-23

We summarize the relevant facts from the record, primarily relying on the evidence presented at the hearings on the motions to suppress. That evidence established that in 2017, defendant was being investigated by two law enforcement agencies: the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and the New Jersey State Police (NJSP).

A.     The ATF Investigation.

In April 2017, Special Agent Teresa Petit of the ATF began investigating Anthony Hammond for possible weapons trafficking. Using law enforcement databases, Petit learned that a firearm purchased by Hammond in Ohio had been recovered by law enforcement personnel in Camden, New Jersey several months after Hammond had made his purchase. Petit became suspicious of the short time frame between the purchase and the recovery of the gun and researched Hammond's gun purchasing activities. During that investigation, Petit learned that Hammond's name appeared in several multi-sales reports in Ohio, indicating that he had purchased two or more firearms within five days. Those reports also showed Hammond had repeatedly purchased the same type of firearms.

As part of her investigation, Petit performed a "deconfliction query" to see if Hammond was being investigated by other law enforcement agencies. Her query revealed that there were no other active investigations of Hammond, but

3

there was an intelligence report submitted by ATF Special Agent William Campbell from the Camden, New Jersey field office. That report noted that a gun recently purchased by Hammond had been recovered in Camden.

In May and June 2017, Petit continued to monitor Hammond's purchases of firearms. During that time, she learned that Hammond had engaged in numerous transactions, often purchasing more than one gun at a time, and had purchased a total of thirty-five firearms. Petit also obtained surveillance video footage from a gun store where Hammond had made numerous purchases of firearms. In reviewing the footage, Petit noted that Hammond was always accompanied by a second individual and she became suspicious that that other individual was directing Hammond on which firearms to purchase.

On June 21, 2017, Petit was able to identify the second individual as defendant. She made that identification by working with Detective Jerry Orick, an ATF Task Force officer from the Columbus, Ohio Division of Police. Orick accessed the Columbus Division of Police's report system and learned that in December 2016, defendant's home in Columbus had been burglarized and firearms owned by Hammond had been reported as stolen. Petit and Orick then obtained a photograph of defendant from the Ohio Bureau of Motor Vehicles.

4

A comparison of that photograph to the images from the surveillance footage indicated that defendant was the person with Hammond at the gun store.

In mid-June 2017, Petit spoke with Special Agent Ryan Bell from the ATF's Camden field office. Bell advised Petit that a task force in New Jersey was conducting a narcotics investigation and that some of the firearms purchased by Hammond had been recovered during that investigation. At that time, Petit did not make any contact with New Jersey state or local law enforcement, including the NJSP.

After identifying defendant, Petit learned that he was from New Jersey and that he had an active federal warrant for his arrest. Given that information and given that Hammond was continuing to purchase firearms in Ohio, Petit decided to try to track Hammond and defendant by pinging their cell phones to reveal their locations.

On June 22, 2017, Orick applied to defendant's and Hammond's cell phone carriers for exigent pings using the cell phone numbers referenced in the police report from the December 2016 burglary. That same day, those providers authorized the pings.

The following day, on June 23, 2017, Orick submitted applications to an Ohio state court for installation and use of pen register number recording devices

A-0020-23

for defendant's and Hammond's cell phones. The Ohio court granted the application and signed an order authorizing the pen registers that same day. Orick then served that order on the cell phone providers and ATF started receiving GPS data concerning the location of defendant's and Hammond's cell phones.

The ping data revealed that defendant and Hammond were traveling from Ohio toward New Jersey on June 22, 2017. Petit therefore put out a "be on the lookout" notice to local law enforcement in Pennsylvania and New Jersey. That notice provided local law enforcement with Hammond's vehicle information, warned that defendant was a federal fugitive, and advised that the vehicle would likely contain firearms.

Neither defendant nor Hammond were apprehended at that time by any law enforcement agency. Instead, the cell phone location data indicated that Hammond and defendant traveled to Camden, New Jersey on the night of June 22 and returned to Columbus, Ohio on June 24, 2017. Thereafter, the ATF continued to surveil defendant and Hammond, monitoring their firearm purchases, and acquired a search warrant to place a GPS tracker on Hammond's vehicle.

B. The NJSP Investigation.

6

A-0020-23

Beginning in May 2017, Detective Sergeant Erik Hoffman of the NJSP started investigating the activities of Eduardo Caban. Initially, the investigation focused on narcotic activity but by early June 2017, the NJSP shifted its focus to firearm trafficking. In that regard, an individual arrested by the NJSP had informed them that he could purchase firearms from Caban. Accordingly, starting on June 3, 2017, the NJSP conducted several controlled firearms purchases from Caban using an informant. Based on information obtained from those controlled purchases, the NJSP traced the firearms and discovered that many of the guns had been purchased by Hammond in Ohio.

Sometime in June 2017, Hoffman spoke with Bell from the Camden ATF office and was told that there was an ongoing investigation in Ohio concerning Hammond. Hoffman did not contact the ATF or any law enforcement personnel in Ohio in June 2017, nor was he aware of defendant's involvement in Hammond's purchases at that time.

On July 6, 2017, representatives from the ATF and NJSP, including Petit and Hoffman, had a conference call to discuss their respective investigations. During that call, Hoffman learned of the ATF's investigation into defendant. Petit briefed Hoffman on the ATF's investigation and Hoffman shared with Petit information the NJSP had learned. Thus, Petit learned that the NJSP had

7

conducted controlled purchases and had traced the firearms purchased from Caban to firearms that had originally been purchased by Hammond. Following the July 6 conference, Petit shared with the NJSP defendant's and Hammond's cell phone location data.

On July 7, 2017, the NJSP had an informant make two more controlled firearm purchases from Caban. Using ATF-provided ping data, Hoffman knew defendant was traveling towards Caban's home on July 7, 2017. Accordingly, the NJSP planned to conduct the controlled purchases after defendant arrived and then stop defendant's vehicle once he left Caban's home. Defendant arrived at Caban's home, and the controlled purchases took place as planned. When defendant left Caban's home, however, the NJSP lost sight of his vehicle in traffic and were not able to stop the vehicle.

Two days later, on July 9, 2017, a vehicle driven by defendant was pulled over in West Virginia for speeding. Corporal Erick McFarland of the West Virginia State Police conducted the vehicle stop. When McFarland approached defendant's vehicle, he detected a "light odor" of marijuana coming from the vehicle. McFarland also noticed that defendant was accompanied by a female who was sitting in the front passenger seat. McFarland directed defendant to exit the vehicle and to sit in the front passenger seat of his police car. McFarland

A-0020-23

then ran a check on defendant's license and discovered it was suspended. McFarland also learned that defendant had a federal warrant for his arrest and was informed that he was considered armed and dangerous.

Thereafter, McFarland placed defendant in handcuffs and ordered the female passenger to exit defendant's vehicle. McFarland then searched defendant's vehicle. In the passenger section of the car, McFarland found and seized two cell phones that belonged to defendant. McFarland also searched the trunk and found a black duffle bag with approximately $6,000 in cash.

McFarland then called for a canine unit to check for further evidence of possible narcotics trafficking. In response, Corporal Eric Burke of the Wheeling, West Virgina Police Department and his canine came to the scene. The canine alerted to the presence of narcotics and the female passenger told Burke that other people who smelled of marijuana had previously been in the car.

During the vehicle stop, McFarland asked defendant for consent to search his cell phones, but defendant declined. Thereafter, defendant was taken to police headquarters. While at the headquarters, defendant asked for contact information stored in his cell phones. McFarland informed him that he could not have his cell phones but offered to get the information for defendant.

A-0020-23

Defendant then provided his passcodes to McFarland and McFarland obtained the contact information defendant wanted and gave it to him. McFarland also wrote down the passcodes on pieces of paper and taped those codes to the phones.

McFarland was informed that the ATF planned to retrieve the phones and apply for warrants to search the phones. The ATF, however, never picked up the phones. Instead, on September 8, 2017, officers from the NJSP came and took the phones. On September 29, 2017, the NJSP applied for and obtained communication data warrants to access both of defendant's cell phones.

C.  The Indictment.

On February 6, 2018, a New Jersey state grand jury returned an indictment charging defendant with thirty-five crimes, including first-degree racketeering (count one); second-degree conspiracy, N.J.S.A. 2C:5-2 (count two); first-degree leader of a firearms trafficking network (count three); first-degree promoting organized street crime, N.J.S.A. 2C:33-30 (count four); and numerous weapons-related offenses, as well as two counts of third-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25 and N.J.S.A. 2C:2-6.

A-0020-23

D.  The Motion to Suppress Information from the Cell Phones.

In March 2018, defendant moved to suppress evidence obtained from his cell phones.  Defendant contended that the cell phones had been seized unlawfully.  He also moved to suppress statements he had made to McFarland. At an August 21, 2018 evidentiary hearing on that motion, the court heard testimony from McFarland and Burke.  Defendant argued that McFarland lacked probable cause to search his car because the officers' testimony was inconsistent concerning the smell of marijuana.  Thus, defendant contended that the items found in the vehicle were fruits of a poisonous tree.

The trial court found both McFarland and Burke to be credible witnesses. The court determined that West Virginia law governed the question of the legality of the stop and search.  The court then found that McFarland had lawfully stopped defendant's vehicle for speeding and had probable cause to search the car based on the odor of marijuana.  Additionally, the court found no search warrant was required because the search had been conducted incident to defendant's arrest.

Finding that no Miranda[1] warning had been given, the trial court suppressed defendant's statements made to McFarland.  The court also reasoned,

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0020-23

however, that law enforcement personnel would have obtained a communication data warrant for the cell phones and would have inevitably discovered all information obtained from the phones through a lawful warrant. Accordingly, on August 23, 2018, the trial court entered an order denying defendant's motion to suppress the information from the cell phones but granting his motion to suppress the statements he had given to McFarland.

E. The Motion to Suppress the Cell Phone Location Data.

Over a year later, on January 15, 2020, defendant filed a second motion to suppress, this time challenging the cell phone location information obtained by the ATF and shared with the NJSP. On August 17, 2021, an evidentiary hearing on that motion was conducted. At the hearing, the court heard testimony from Petit, Orick, and Hoffman. The central issue at that hearing was whether the ATF and NJSP had conducted a joint investigation when acquiring defendant's location data and when the data was shared with the NJSP.

Petit testified that before July 6, 2017, she had no contact with any officers of the NJSP, including Hoffman. She explained that she first spoke to Hoffman during the conference call on July 6, 2017, and thereafter they spoke several other times. She also explained that when she made her deconfliction query in April 2017, she did not have any contact with the NJSP, even after she reviewed

A-0020-23

the intelligence report prepared by an ATF agent in the Camden, New Jersey field office.

Orick testified that no NJSP officer was involved in any way when the ATF decided to apply for exigent pings and the pen registers for the cell phones of defendant and Hammond. Thus, Orick explained that neither the NJSP nor any other state or local New Jersey law enforcement personnel were involved in the request for the cell phone location data.

In his testimony, Hoffman explained that his first communications with anyone involved with the ATF investigation in Ohio occurred during the conference in July 2017. He also explained that following that conference he received location data regarding defendant from the ATF.

On September 16, 2021, the trial court placed an oral decision on the record concerning the motion. The court first noted that all three witnesses had provided credible testimony. The trial court then analyzed what law governed the searches. In that regard, the court reasoned that both the exigent ping request and the pen registers requests were not lawful under New Jersey law because they were obtained without warrants. The court also recognized, however, that if federal and Ohio law was applied, the searches were probably lawful. Accordingly, the trial court focused on the "critical" determination of whether

13

New Jersey or federal and Ohio law applied and reasoned that question was controlled by whether an agency relationship existed between the NJSP and the ATF.

The court found that the ATF and NJSP had conducted separate investigations. Thus, the court determined that when the cell phone location data was obtained by the ATF, NJSP was not involved. Indeed, the trial court found that there was no communication or coordination between the ATF and NJSP until the July 6, 2017 conference.

Analyzing the ATF's search under federal and Ohio law, the court found there was no requirement in 2017 for a search warrant for either the ping or pen registers. Citing Carpenter v. United States, 585 U.S. 296 (2018), the motion court noted that in 2018 the United States Supreme Court held that a warrant is required for those types of searches. The court went on to reason, however, that because Petit and Orick acted in good faith in 2017, when they obtained the cell location data, the data had been obtained lawfully. Accordingly, on September 20, 2021, the court entered an order denying defendant's motion to suppress the cell phone location data.

A-0020-23

F. Defendant's Plea.

The following year, on September 20, 2022, defendant pled guilty to first-degree racketeering (count one) and first-degree leader of a firearms trafficking network (count three). In exchange for defendant's guilty plea, the State agreed to recommend a sentence on count one of twelve years in prison, subject to NERA. The State also agreed to recommend a consecutive twelve-year sentence on count three. Additionally, the State agreed to recommend the dismissal of the thirty-three remaining counts.

In pleading guilty, defendant admitted that he and at least six other individuals had engaged in a weapons trafficking enterprise, which involved transporting firearms from Ohio to New Jersey. Defendant also admitted that he was the leader of the operation and "organized everything."

In January 2023, the trial court sentenced defendant in accordance with the plea agreement. Thus, in aggregate defendant was sentenced to twenty-four years in prison, with twelve of those years subject to NERA.

II.

On appeal, defendant challenges the orders denying his motions to suppress evidence. His counsel presents two main arguments:

A-0020-23

POINT I – THE TRIAL COURT ERRED IN DENYING [DEFENDANT'S] MOTION TO SUPPRESS THE CELL PHONE LOCATION DATA.

POINT II – THE TRIAL COURT ERRED IN DENYING [DEFENDANT'S] MOTION TO SUPPRESS EVIDENCE OBTAINED FROM A SEARCH OF [DEFENDANT'S] CELL PHONES.

In a supplemental brief, prepared by defendant, he adds the following arguments:

Point 1 – The judge made an error of law when she applied Ohio's good-faith exclusionary rule in this court case.

Point 2 – The judge erred when he failed to suppress cell phone search warrant that utilized "illegally obtained statements" from interrogation that the judge himself previously ruled was unconstitutionally obtained.

Point 3 – The judge should have suppressed the cell phone passcodes and derivative evidence gain threw exploitation of the passcodes to conduct the search of the cell phone.

## III.

In evaluating a trial court's ruling on suppression motions following a hearing, our review is "exceedingly narrow." State v. Barrow, 408 N.J. Super. 509, 516 (App. Div. 2009) (quoting State v. Locurto, 157 N.J. 463, 470 (1999)). "[A]n appellate court reviewing a motion to suppress must uphold the factual

A-0020-23

findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Ahmad, 246 N.J. 592, 609 (2021) (alteration in original) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). Deference is afforded "because the 'findings of the trial judge . . . are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Reece, 222 N.J. 154, 166 (2015) (omission in original) (quoting Locurto, 157 N.J. at 471). Accordingly, we give deference to a "trial judge's credibility determinations." Barrow, 408 N.J. Super. at 516. By contrast, the trial court's interpretation of the law and the legal "consequences that flow from established facts" are reviewed de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

## IV.

"In nearly identical language, the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee people the right 'to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]'" State v. Bryant, 483 N.J. Super. 13, 29 (App. Div. 2025) (quoting U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7). The "basic purpose" of that constitutional right "is to safeguard the privacy and

security of individuals against arbitrary invasions by governmental officials." Carpenter, 585 U.S. at 303 (quoting Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528 (1967)).

When a search is conducted outside of New Jersey, a threshold issue is what law governs the legality of the search and seizure. See State v. Mollica, 114 N.J. 329, 345 (1989). The New Jersey Supreme Court has recognized:

> With regard to law-enforcement activities, a state constitution ordinarily governs only the conduct of the state's own agents or others acting under color of state law. It is this fundamental understanding of the jurisdictional reach of state constitutions that has guided courts in determining whether, if at all, a state constitution can be applied to the officers of another state exercising only the lawful authority of that state.
>
> [Ibid.]

Accordingly, if federal law enforcement officers acting outside of New Jersey obtain evidence, the issue is whether those officers acted in conformity with federal law and the law of the state where they were acting. Id. at 352-53; see also State v. Evers, 175 N.J. 355, 376-77 (2003).

If the federal officers thereafter share information with New Jersey law enforcement officers, and New Jersey uses that information against a defendant, the question is whether there was an agency relationship between the federal officers and the New Jersey officers at the time of the search and seizure. See

18

Mollica, 114 N.J. at 349 (explaining "the presence or absence of agency between the officers of [] two sovereigns . . . determines the applicability of the constitutional standards of the forum jurisdiction"); Evers, 175 N.J. at 377 (recognizing that "the absence of any agency or control over another jurisdiction's law enforcement authorities limit[s] the application of the constitutional standards of [New Jersey]").  For example, in Mollica, federal officers, without a warrant, secured telephone billing records of an occupant of a hotel and turned the records over to New Jersey law enforcement authorities, who used the information to obtain a warrant to search Mollica's hotel room. 114 N.J. at 334.  The seizure of the telephone billing records would have been illegal under the New Jersey Constitution.  Id. at 345.  Nevertheless, the New Jersey Supreme Court held that New Jersey law enforcement officers could use the information the federal authorities conveyed to them if the federal officers had acted independently and in conformity with federal law in seizing the telephone billing records. Id. at 334-35, 357.  Accordingly, the Court remanded to allow the trial court to develop the record on that issue. Id. at 357.

The New Jersey Supreme Court has recognized that the sharing of information requires an analysis of whether there is an intergovernmental agency relationship.  In that regard, the Court has explained:

This case [] requires us to consider the implications of the silver platter doctrine and its key element: intergovernmental agency. An important aspect of this determination is whether for constitutional purposes the federal agents can be said to be acting under the "color of state law."

The assessment of the agency issue necessarily requires an examination of the entire relationship between the two sets of government actors no matter how obvious or obscure, plain or subtle, brief or prolonged their interactions may be. The reasons and the motives for making any search must be examined as well as the actions taken by the respective officers and the process used to find, select, and seize the evidence.

[Id. at 355-56.]

The Court has also explained that if the investigation is intended for a New Jersey prosecution, the federal agents can, in effect, be deemed agents of New Jersey and thus subject to New Jersey law. State v. Minter, 116 N.J. 269, 283 (1989). If on the other hand, the federal officers act independently of New Jersey officers, then the seized evidence can be used in a New Jersey prosecution. See Mollica, 114 N.J. at 357 (explaining that New Jersey constitutional protections "do not govern the legality of the actions of federal officers" when they act "independently and without the cooperation or assistance of [New Jersey] state officers with respect to the seizure of [] evidence").

A.   The Cell Phone Location Data.

In one of his motions, defendant sought to suppress all information derived from the ping and cell phone location data obtained by the ATF and shared with the NJSP.  The trial court correctly recognized that the suppression of that information depended on whether federal and Ohio law applied or whether New Jersey law applied.  The court also correctly recognized that determination turned on whether there was an agency relationship between the ATF and the NJSP when the data was obtained and when it was shared.

In the brief submitted by defense counsel, there is no argument that the ATF did not act in conformity with federal and Ohio law in 2017, when they obtained cell phone location data.  Defense counsel also does not dispute that the ATF agents acted in good faith in 2017, and that under federal and Ohio law the subsequent change in the warrant requirement would not result in the suppression of the data.  In a supplemental brief filed by defendant he disputes both those points.  Defendant's arguments, however, lack merit and do not warrant discussion in this opinion.  See R. 2:11-3(e)(2).

Consequently, the controlling issue is whether the ATF officers were acting as agents of New Jersey when they obtained defendant's cell phone location data.  The trial court resolved that factual question after hearing

21

testimony from the three officers most involved in the investigations. Those officers consistently testified that the ATF investigation was independent of the NJSP investigation and at no point in time were the federal officers acting as agents of New Jersey. Relying on that testimony the trial court found that the two investigations were separate and distinct, and the ATF never acted as an agent for the NJSP. Those findings are amply supported by the evidence presented at the hearing.

The evidence at the hearing also amply supports the trial court's determination that there was no communication between the ATF and NJSP when the ATF first applied for the exigent ping and the subsequent pen registers. Moreover, the evidence also supports the trial court's determination that even when the cell phone location data was shared with NJSP in July 2017, there was no agency relationship. Instead, there was sharing of information between two governmental agencies, but the mere sharing of information did not create an agency relationship. See Mollica, 114 N.J. at 355 (explaining that "mere contact, awareness of ongoing investigations, or the exchange of information may not transmute the relationship into one of agency"); State v. Knight, 145 N.J. 233, 259 (1996) (same).

A-0020-23

B.    The Search of the Cell Phones.

In challenging the denial of the motion to suppress the information obtained from his cell phones, defendant presents three arguments.  First, defense counsel contends that there was an undue delay between when defendant's cell phones were seized and when they were searched and that delay violated defendant's constitutional rights.   Second, defendant, in his supplemental brief, contends that the motion judge erred because the search of his cell phones used information derived from his statements to McFarland and those statements had been suppressed.  Finally, in his supplemental brief, defendant asserts that the motion judge should have suppressed his cell phone passcodes and that the use of those passcodes made the search of the cell phones illegal.  We are not persuaded by any of these arguments.

The delay argument was not presented to the trial court on the motion to suppress information obtained from the cell phones.  Instead, before the trial court, defendant argued that the motor vehicle stop in West Virginia and the ensuing search of the car, during which the cell phones were seized, were illegal.

We, therefore, decline to consider defendant's new delay argument on this appeal.  Rule 3:5-7(d) allows "a defendant to appeal the denial of a Fourth Amendment-based motion to suppress evidence after a conviction whether based

23

on a guilty plea or a conviction." State v. Knight, 183 N.J. 449, 471 (2005). Nevertheless, "[a]ppellate review is not limitless. The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves." State v. Robinson, 200 N.J. 1, 19 (2009). In other words, a defendant's right to appeal under Rule 3:5-7(d) does not extend to all possible arguments that could have been raised. Instead, defendant is limited to the arguments he raised on a motion to suppress. See State v. Witt, 223 N.J. 409, 418 (2015).

The New Jersey Supreme Court has expressly addressed this limitation on what a defendant can raise on an appeal of a motion to suppress. See Witt, 223 N.J. at 418. In Witt, the Court considered whether a defendant's "mere filing of a motion to suppress under Rule 3:5-7(a) required the State 'to justify every aspect of [a] warrantless search,'" including aspects of the search the defendant "did not challenge at the suppression hearing." Ibid. The Court held that a defendant could not raise a new argument. In that regard, the Court explained:

> We reject defendant's contention that the State must disprove issues not raised by the defense at a suppression hearing. Defendant's approach would compel the State to cover areas not in dispute from fear that an abbreviated record will leave it vulnerable if the defense raises issues for the first time on appeal. Requiring the State to disprove shadow issues will

needlessly lengthen suppression hearings and result in an enormous waste of judicial resources.

[Ibid.]

The Court further observed that when a defendant fails to raise an issue at a suppression hearing it results in a record that is "barren of facts that would shed light on th[e] issue." Ibid. Indeed, "the points of divergence developed in proceedings before a trial court define the metes and bounds of appellate review." Id. at 419 (quoting Robinson, 200 N.J. at 19). When a party fails to make its position known so that it can be explored at the trial court, it "denie[s] the trial court the opportunity to evaluate the claim in an informed and deliberate manner; and [] denie[s] any reviewing court the benefit of a robust record within which the claim could be considered." Robinson, 200 N.J. at 21. In those circumstances, a reviewing court "should [] decline[] to entertain the belatedly raised issue." Witt, 223 N.J. at 419; see also State v. Ellison, 482 N.J. Super. 357, 385 (App. Div. 2025) (declining "to address issues not properly presented to the trial court for consideration").

All the concerns identified in Witt support our decision to not consider the delay argument for the first time on appeal. Because the issue was not raised before the trial court, there was no testimony as to why the West Virginia authorities retained the cell phones after defendant was released. There was also

no testimony or evidence as to whether defendant requested the return of his cell phones. Finally, there was no testimony or evidence concerning why agents from the NJSP came to pick up the cell phones on September 8, 2017.

We also note that defendant's delay argument relies on applying New Jersey law, and particularly New Jersey constitutional law. We reject that contention for two reasons. First, we are not convinced that any law would mandate the suppression of the information from the cell phones because of the alleged delay in seeking communication data warrants to access the information in the cell phones. Second, the record does not clearly show whether West Virginia law or New Jersey law should be applied to the new argument being raised for the first time on this appeal.

Finally, we also reject the two arguments raised by defendant in his supplemental brief. The motion judge determined that lawful warrants for the search of the cell phones would have inevitably been obtained. That analysis is not undercut by defendant's arguments that he had voluntarily given his passcodes to McFarland. Nor is the inevitability doctrine application undercut because the volunteered passcodes were taped to the cell phones when they were turned over to NJSP.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanley

Clerk of the Appellate Division

A-0020-23